1  SHARTSIS FRIESE LLP
   JAMES P. MARTIN (Bar #170044)
2  JOSEPH V. MAUCH (Bar #253693)
   One Maritime Plaza, Eighteenth Floor
3  San Francisco, CA 94111
   Telephone: (415) 421-6500
4  Facsimile: (415) 421-2922
   Email: jmartin@sflaw.com; jmauch@sflaw.com
5
   Attorneys for Plaintiffs
6  PH(X) GLASS, LLC and CHRISTOPHER
   CARSTENS
7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11 PH(X) GLASS, LLC and CHRISTOPHER        Case No.  C 08-02533 PJH
   CARSTENS,
12                                          **AMENDED COMPLAINT FOR BREACH
                Plaintiffs,                 OF CONTRACT, PATENT
13                                          INFRINGEMENT, TRADEMARK
        v.                                  INFRINGEMENT, FALSE ADVERTISING,
14                                          UNFAIR COMPETITION, UNFAIR
   ROLAND CLARKE, PIC GLASSWARE,            BUSINESS PRACTICES,
15 INC., JAMN EXACT, INC., and DOES 1       CONSTRUCTIVE TRUST,  AND
   through 10, inclusive,                   DECLARATORY RELIEF**
16
                Defendants.                 **DEMAND FOR JURY TRIAL**
17

18

19      Plaintiffs PH(X) Glass, LLC ("PH(X) Glass"), and Christopher Carstens ("Carstens")

20 (collectively "Plaintiffs"), by their attorneys, for their Complaint against Defendants Roland

21 Clarke ("Clarke"), PIC Glassware, Inc. ("PIC Glassware"), Jamn Exact, Inc. ("Jamn Exact"), and

22 DOES 1-10 (collectively "Defendants"), aver as follows:

23                      **NATURE OF THE ACTION**

24      1.      This is an action in law and equity for, among other things, breach of contract,

25 patent infringement, trademark infringement, and unfair competition.  As described in detail

26 below, PH(X) Glass is the owner of various common law trademarks, including "PH(X)" and

27 "PH(X) GLASS," as well as the logos incorporating such marks (the "Marks").  PH(X) Glass is

28 also the owner of United States Patent No. 6,935,345 ("the '345 Patent"), a copy of which is

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    attached hereto as **Exhibit A**.

2    2.    Plaintiff Carstens is an inventor and the original owner of the '345 Patent and the

3    Marks.    On June 1, 2005, Carstens entered into a written agreement with Defendants PIC

4    Glassware and Clarke, whereby Carstens agreed to assign his rights to the '345 Patent and the

5    Marks to Defendants in return for monthly payments of $10,000 until Carstens had received a

6    total amount of $1,500,000.    As set forth in more detail below, Defendants have breached the

7    written agreement by failing to pay Carstens the amounts owed.    As a result of such breach, all

8    right, title and interest in and to the '345 Patent and the Marks automatically and immediately

9    reverted to Carstens pursuant to the terms of the parties' contract.

10    3.    Although Defendants have ceased making the contractual payments to Carstens,

11    Defendants continue to sell products with the "PH(X)" trademarks that are covered by the '345

12    Patent.    Carstens, after assigning his rights to PH(X) Glass, now brings this action with PH(X)

13    Glass to enjoin Defendants from continuing to infringe upon the '345 Patent and the Marks, and

14    to recover the money owed and the profits wrongfully received by Defendants through their

15    illegal conduct.

16    <u>**JURISDICTION**</u>

17    4.    This Court has jurisdiction over the federal claims pursuant to 15 U.S.C. § 1121

18    (action arising under the Lanham Act); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1338(a)

19    (any Act of Congress relating to trademarks); and 28 U.S.C. §§ 2201-2202 (declaratory

20    judgment).    The Court has supplemental jurisdiction over the state law claims pursuant to 28

21    U.S.C. §§ 1338(b) and 1367 because the state law claims are joined with substantial and related

22    claims under federal law, according to the principles of supplemental jurisdiction, and because

23    they form part of the same case and controversy under Article III of the United States

24    Constitution.

25    <u>**VENUE**</u>

26    5.    Venue is proper in the Northern District of California pursuant to 28 U.S.C.

27    1391(b), (c), and (d) because, on information and belief, Clarke is an alien; Defendants do

28    substantial business in this District; Defendants have committed acts of breach of contract, patent

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 2 -

Case No.    AMENDED COMPLAINT: PATENT INFRINGEMENT, TRADEMARK
INFRINGEMENT, UNFAIR COMPETITION, BREACH CONTRACT

and trademark infringement, and unfair business practices in this District; and the claims arose in this District.

## INTRADISTRICT ASSIGNMENT

6.      Pursuant to Local Rule 3-2, Intellectual Property actions are assigned on a district-wide basis.

## PARTIES

7.      Plaintiff PH(X) Glass is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 17287 Skyline Boulevard, Woodside, California 94062.

8.      Plaintiff Christopher Carstens is the managing member of PH(X) Glass.  Carstens is a citizen of the State of California residing in Woodside, California.

9.      On information and belief, Defendant PIC Glassware is a corporation organized under the laws of Canada with its principal place of business in Dundas, Ontario, Canada.  On information and belief, Defendant Clarke is a director and officer of PIC Glassware.   On information and belief, Clarke is a citizen of Canada living in Alameda, California.  Defendants PIC Glassware and Clarke are doing business, and the acts alleged herein have occurred, in this District.

10.      On information and belief, Defendant Jamn Exact is a corporation organized under the laws of California with its principal place of business in Alameda, California.  On information and belief, Jamn Exact was incorporated by Clarke in 2006 in order to warehouse, pack, and ship the water pipes and other merchandise marketed and sold by PIC Glassware, as described below. On information and belief, the address of Jamn Exact on file with the California Secretary of State is the same address as the warehouse used by PIC Glassware and Clarke.  On information and belief, Clarke is the president of Jamn Exact and the sole officer and director.

11.      On information and belief, there exists, and at all times relevant herein there existed, a unity of interest and ownership among PIC Glassware, Jamn Exact, and Clarke such that any individuality and separateness between them has ceased and PIC Glassware and Jamn Exact are the alter egos of Clarke.  On information and belief, at all times relevant hereto, each of

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 3 -

Case No.                    AMENDED COMPLAINT: PATENT INFRINGEMENT, TRADEMARK
INFRINGEMENT, UNFAIR COMPETITION, BREACH CONTRACT

1  the Defendants acted as the agent and representative of the other, each aided and abetted the

2  actions taken by each other, and each was acting within the course and scope of his or her agency

3  in connection with each of the actions and events that form the subject matter of this action.

4        12.    Plaintiffs are ignorant of the true names and capacities of Defendants sued herein

5  as Does 1 through 10, and therefore sue these Defendants by such fictitious names. Plaintiffs will

6  amend this Complaint to allege the true names and capacities of Does 1 - 10 when ascertained.

7  Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named

8  Defendants is in some manner responsible for the injury and damages to Plaintiffs alleged herein.

9  **FACTUAL BACKGROUND**

10        13.    On or about February 28, 2002, Carstens and his father, Daniel Carstens, filed with

11  the United States Patent and Trademark Office ("the PTO") a Provisional Patent Application,

12  United States Serial No. 60/360,319, entitled "Healthier and More Efficient Tobacco Water Pipe

13  by Means of Multiple Chambers."

14        14.    In and around June 2002, Carstens began using the Marks in commerce on glass

15  water pipes that were the subject of the Provisional Patent Application. Carstens subsequently

16  sold a large number of products bearing the Marks, which products and Marks became well

17  known to consumers and acquired considerable goodwill.

18        15.    On or about February 28, 2003, a Nonprovisional (Utility) Patent Application for

19  the invention, United States Serial No. 10/377,417, entitled "Method for Generating Small

20  Bubbles for a Smoke-Filled Air Stream," was filed with the PTO. On or about February 17,

21  2005, the PTO issued a Notice of Allowance for all of the claims of the Nonprovisional Patent

22  Application. The '345 Patent subsequently issued on or about August 30, 2005.

23        16.    After the Notice of Allowance was received and prior to the issuance of the '345

24  Patent, Carstens entered into a Technology and Patent Rights Sale Agreement with Clarke and

25  PIC Glassware, effective June 1, 2005 (the "Agreement"), which is attached hereto as **Exhibit B**.

26  The Agreement was never modified or amended by the parties.

27        17.    Pursuant to the Agreement, Carstens agreed that he would assign certain

28  intellectual property rights to PIC Glassware and Clarke in return for specified payments over

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

time.  Pursuant to Section 2.3 of the Agreement, PIC Glassware and Clarke were jointly and severally obligated to deliver to Carstens one hundred fifty (150) monthly payments, each in the minimum amount of $10,000.00, from the effective date of the Agreement until Carstens had received the total amount of $1,500,000.00.  The first monthly payment was due on July 1, 2005.  Each subsequent monthly payment was required to be delivered to Carstens by the first day of the month following the previous monthly payment.

18.    Defendants have failed to pay Carstens the amounts due under the Agreement. Defendants made partial payments to Carstens corresponding to the amounts due pursuant to the Agreement, which payments ranged from $0 to $7,500 each month following the Effective Date of the Agreement through January 2007.  Defendants have made no payments to Carstens since that time.  At no time did Defendants ever tender to Carstens a monthly contractual payment equal to or greater than the $10,000 minimum required by the Agreement.  Although Carstens cashed some of the checks for partial payment by Defendants, Carstens did not waive Defendants' compliance thereunder.  Moreover, Section 5.8 of the Agreement prohibits any modification or amendment except by another agreement in writing signed by the parties, and the parties never signed such an agreement.  Pursuant to Section 2.3 of the Agreement, Defendants' failure to pay the amounts due constituted an immediate and material breach of the Agreement.

19.    All rights to the '345 Patent and the Marks immediately reverted to Carstens upon Defendants' failure to pay the amounts due.  Pursuant to Section 3.2 of the Agreement, all right, title and interest in "Patent Rights, Trademark Rights, Technology, and Confidential Information" (as defined in the Agreement) immediately reverted to Carstens following Defendants' failure to deliver on time any of the monthly payments required under the Agreement.  The Agreement defines "Patent Rights" to include, among other things, the '345 Patent, and defines "Trademark Rights" to include, among other things, the "PHX" trademark, the PH(X) logo and the PHXGLASS.COM domain name.

20.    Although Defendants have ceased making any payments to Carstens, Defendants have continued to infringe the '345 Patent and the Marks by selling water pipes covered by the '345 Patent with the "PH(X)" trademark following termination of the Agreement.  Defendants

- 5 -

advertise their water pipes and other products with the "PH(X)" mark in magazines with national circulation and on  Internet websites such as PHXGLASS.COM, PHXGLASS.CA and CAFEPRESS.COM/PHXCPSHOP.  The products sold by Defendants include, not only the water pipes covered by the '345 Patent, but also T-shirts, coffee mugs, tote bags, hats, stickers, magnets and other merchandise bearing the "PH(X)" mark.  The sale by Defendants of such merchandise bearing the Marks following termination of the Agreement constitutes trademark infringement.

21.     On February 29, 2008, Plaintiffs sent a cease and desist letter to Defendants. Among other things, Plaintiffs requested that Defendants confirm in writing that they would immediately cease and desist from any further use of the "Patent Rights, Trademark Rights, Technology and Confidential Information," as each is defined in the Agreement.  A copy of Plaintiffs' February 29, 2008 letter is attached hereto as **Exhibit C**.

22.     On March 3, 2008, Defendants responded to Plaintiffs' February 29 letter. Defendants' letter appears to have been written without the assistance of legal counsel, and, among other things, Defendants refused to cease and desist from any further infringement.  A copy of Defendants' March 3, 2008 letter (without enclosures) is attached hereto as **Exhibit D**.

23.     On March 9, 2008, Plaintiffs sent another letter to Defendants, which letter urged Defendants to retain legal counsel and reiterated Plaintiffs' requests and legal position.  In response to Defendants' request, Plaintiffs also provided Defendants with a signed copy of the Agreement.  A copy of Plaintiffs' March 9, 2008 letter (without enclosures) is attached hereto as **Exhibit E**.

24.     Defendants subsequently retained legal counsel, but the parties' efforts to avoid litigation were unsuccessful.

25.     On information and belief, PIC Glassware and Clarke continue to market and sell infringing water pipes and merchandise.

26.     On information and belief, Clarke has attempted, on at least one occasion, to pass himself off as Carstens and/or as a representative of PH(X) Glass in order to market and sell infringing water pipes and merchandise.

27.     Defendants' actions have caused, and will continue to cause, substantial injury,

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1    harm and damage to Plaintiffs, and said acts and damage will continue unless restrained by this

2    Court.  Among other things, such damage includes, without limitation, monetary damages, as

3    well as irreparable harm caused by Plaintiffs' loss of control over the Marks.  In addition,

4    Defendants have been unjustly enriched by their infringing conduct, and have profited by

5    intentionally infringing the '345 Patent and the Marks, and by trading off of Plaintiffs' goodwill

6    and reputation.  Through this action, Plaintiffs seek, among other things, to preliminarily and

7    permanently enjoin Defendants from infringing the '345 Patent and the Marks and to recover

8    damages and disgorgement of profits obtained by Defendants through their illegal conduct.

9                                    **FIRST CLAIM FOR RELIEF**

10                                   **Breach of Written Contract**

11         28.    Plaintiffs incorporate by this reference each and every allegation of paragraphs 1

12    through 27 above.

13         29.    Carstens has fully performed or is excused from performing all of his obligations

14    under the Agreement and has not breached the Agreement.

15         30.    Clarke and PIC Glassware have breached and continue to breach the terms of the

16    Agreement.

17         31.    As a direct and proximate result of Clarke and PIC Glassware's breaches of the

18    Agreement, Carstens has suffered damages in an amount to be determined at trial.

19                                   **SECOND CLAIM FOR RELIEF**

20                           **Trademark Infringement under 15 U.S.C. § 1125(a)**

21         32.    Plaintiffs incorporate by this reference each and every allegation of paragraphs 1

22    through 31 above.

23         33.    Plaintiff PH(X) Glass is the owner by written assignment of the Marks, which are

24    inherently distinctive.

25         34.    Plaintiffs have used the Marks in commerce at least as early as June 2002, which

26    use by Plaintiffs preceded Defendants' use of the "PH(X)" trademark.

27

28

Case No.          AMENDED COMPLAINT: PATENT INFRINGEMENT, TRADEMARK
                  INFRINGEMENT, UNFAIR COMPETITION, BREACH CONTRACT

35.    Defendants have infringed upon Plaintiffs' Marks within the meaning of 15 U.S.C. § 1125(a) by, among other things, distributing, advertising, marketing, selling, and offering to sell water pipes and other merchandise under the "PH(X)" trademarks.

36.    Defendants' use of the "PH(X)" mark in interstate commerce after termination of the Agreement constitutes an unauthorized use of the Marks.  Such use is likely to cause confusion, to cause mistake, or to deceive the public as to the affiliation, connection, or association of Defendants with Plaintiffs, or as to source, origin, sponsorship, or approval of Defendants' products by Plaintiffs.

37.    Defendants' acts of trademark infringement have been committed with the intent to cause confusion, mistake, and deception, and were otherwise deliberate, knowing, willful, and/or in bad faith.

38.    Plaintiffs have been and will continue to be greatly harmed by Defendants' acts of trademark infringement.  Plaintiffs are informed and believe, and on that basis allege, that Defendants will continue to infringe on Plaintiff's Marks to the irreparable harm of Plaintiffs unless this infringement is enjoined by this Court, pursuant to 15 U.S.C. § 1116.

## THIRD CLAIM FOR RELIEF

### Patent Infringement

39.    Plaintiffs incorporate by this reference each and every allegation of paragraphs 1 through 38 above.

40.    PHX Glass is the owner by assignment of the '345 Patent.  The two inventors of the '345 Patent, Christopher Carstens and Daniel Carstens, entered into written assignments with PHX Glass, which assignments were recorded with the PTO on or about March 25, 2008.

41.    Defendants have directly infringed the '345 Patent in violation of 35 U.S.C. § 271(a).

42.    The infringement by Defendants is willful and deliberate and is being committed by Defendants intentionally and with full knowledge of the '345 Patent.

43.    As a result of Defendants' infringement, Plaintiffs are entitled to damages under 35 U.S.C. § 284 in an amount to be determined at trial.  Plaintiffs are also entitled to an award of

1  attorney's fees under 35 U.S.C. § 285 because the deliberate infringement by Defendants renders

2  this an exceptional case.

3      44.  Plaintiffs have been and will continue to be greatly harmed by Defendants'

4  infringement of the '345 Patent.  The amount of such damage cannot be determined without

5  discovery and an accounting ordered by this Court.  Plaintiffs are informed and believe, and on

6  that basis allege, that Defendants will continue to infringe on the '345 Patent to the irreparable

7  harm of Plaintiffs unless this infringement is enjoined by this Court, pursuant to 35 U.S.C. § 283.

8                          **FOURTH CLAIM FOR RELIEF**

9                        **Contributory Patent Infringement**

10      45.  Plaintiffs incorporate by this reference each and every allegation of paragraphs 1

11  through 44 above.

12      46.  Defendants have contributorily infringed the '345 Patent by making, having made,

13  selling and offering for sale a product that, when used by Defendants' customers, necessarily

14  infringes the methods claimed in the '345 Patent, which product has no non-infringing use.

15  Plaintiffs are informed and believe, and on that basis allege, that Defendants have instructed

16  manufacturers to produce the infringing products according to Defendants' specifications, and

17  have provided instructions and directions to their customers regarding the use of such products.

18  Defendants perform or cause to be performed each and every element of the method claims of the

19  '345 Patent by directing and controlling such actions.  Such acts by Defendants constitute

20  contributory infringement of the '345 Patent in violation of 35 U.S.C. § 271(c).

21      47.  The contributory infringement by Defendants is being committed by Defendants

22  intentionally and with full knowledge of the '345 Patent.

23      48.  As a result of Defendants' infringement, Plaintiffs are entitled to damages under

24  35 U.S.C. § 284 in an amount to be proved at trial.  Plaintiffs are also entitled to an award of

25  attorney's fees under 35 U.S.C. § 285 because the deliberate infringement by Defendants renders

26  this an exceptional case.

27      49.  Plaintiffs have been and will continue to be greatly harmed by Defendants'

28  infringement of the '345 Patent.  The amount of such damage cannot be determined without

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

Case No.          AMENDED COMPLAINT: PATENT INFRINGEMENT, TRADEMARK
                  INFRINGEMENT, UNFAIR COMPETITION, BREACH CONTRACT

1    discovery and an accounting ordered by this Court. Plaintiffs are informed and believe, and on

2    that basis allege, that Defendants will continue to infringe on the '345 Patent to the irreparable

3    harm of Plaintiffs unless this infringement is enjoined by this Court, pursuant to 35 U.S.C. § 283.

### FIFTH CLAIM FOR RELIEF

#### Inducing Patent Infringement

6        50.    Plaintiffs incorporate by this reference each and every allegation of paragraphs 1

7    through 49 above.

8        51.    Defendants have induced infringement of the '345 Patent by making, having made,

9    selling and offering for sale a product that, when used by Defendants' customers, necessarily

10   infringes the methods claimed in the '345 Patent, which product has no non-infringing use.

11   Plaintiffs are informed and believe, and on that basis allege, that Defendants have instructed

12   manufacturers to produce the infringing products according to Defendants' specifications, and

13   have provided instructions and directions to their customers regarding the use of such products.

14   Defendants perform or cause to be performed each and every element of the method claims of the

15   '345 Patent by directing and controlling such actions. Such acts by Defendants induce

16   infringement of the '345 Patent in violation of 35 U.S.C. § 271(b).

17       52.    The acts of inducing infringement are being committed by Defendants

18   intentionally and with full knowledge of the '345 Patent.

19       53.    As a result of Defendants' infringement, Plaintiffs are entitled to damages under

20   35 U.S.C. § 284 in an amount to be proved at trial. Plaintiffs are also entitled to an award of

21   attorney's fees under 35 U.S.C. § 285 because the deliberate infringement by Defendants renders

22   this an exceptional case.

23       54.    Plaintiffs have been and will continue to be greatly harmed by Defendants'

24   infringement of the '345 Patent. The amount of such damage cannot be determined without

25   discovery and an accounting ordered by this Court. Plaintiffs are informed and believe, and on

26   that basis allege, that Defendants will continue to infringe on the '345 Patent to the irreparable

27   harm of Plaintiffs unless this infringement is enjoined by this Court, pursuant to 35 U.S.C. § 283.

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 10 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

## SIXTH CLAIM FOR RELIEF

### False Advertising and Unfair Competition under 15 U.S.C. § 1125(a)

55.　Plaintiffs incorporate by this reference each and every allegation of paragraphs 1 through 54 above.

56.　Plaintiffs are informed and believe that Defendants have engaged in false advertising and unfair competition within the meaning of 15 U.S.C. § 1125(a). Defendants' use of the "PH(X)" mark in commercial advertising and promotions misrepresents the nature, characteristics, qualities, and origin of its products.

57.　Defendants' acts of false advertising and unfair competition have been committed with the intent to cause confusion, mistake, and deception, and were otherwise deliberate, knowing, willful, and/or in bad faith.

58.　Plaintiffs have been and will continue to be greatly harmed by Defendants' acts of false advertising and unfair competition. Plaintiffs are informed and believe, and on that basis allege, that Defendants will continue to engage in false advertising and unfair competition to the irreparable harm of Plaintiffs unless this infringement is enjoined by this Court, pursuant to 15 U.S.C. § 1116.

## SEVENTH CLAIM FOR RELIEF

### Common Law Unfair Competition

59.　Plaintiffs incorporate by this reference each and every allegation of paragraphs 1 through 58 above.

60.　Defendants actions as alleged herein constitute unfair competition with Plaintiffs.

61.　As a direct and proximate result of Defendants' acts of unfair competition, Plaintiffs have suffered damages in an amount to be determined at trial.

62.　Plaintiffs are further entitled to recover from Defendants the gains, profits, and advantages obtained as a result of their acts of unfair competition.

63.　Defendants' conduct was willful, fraudulent, malicious, oppressive, and intentional. Defendants' conduct was designed to deprive Plaintiffs of the substantial property rights and economic opportunity that they rightfully possessed or possess in the Marks and the

'345 Patent.   Plaintiffs are therefore entitled to exemplary damages and attorneys' fees in accordance with California law.

64.    Plaintiffs have been and will continue to be greatly harmed by Defendants' acts of unfair competition.  Plaintiffs are informed and believe, and on that basis allege, that Defendants will continue to engage in such actions to the irreparable harm of Plaintiffs unless these actions are enjoined by this Court.

## EIGHTH CLAIM FOR RELIEF

### Unfair Business Practices under Cal. Bus. & Prof. Code § 17200

65.    Plaintiffs incorporate by this reference each and every allegation of paragraphs 1 through 64 above.

66.    Defendants' actions as alleged herein constitute unlawful, unfair, or fraudulent business practices in violation of California Business and Professions Code section 17200 *et seq*. Among other things, Defendants have infringed and will continue to infringe on the Marks and the '345 Patent.  Defendants' infringement on the Marks has misled and will continue to mislead the public as to the source, origin, and sponsorship of products bearing the "PH(X)" mark.

67.    Plaintiffs have been and will continue to be greatly harmed by Defendants' unfair business practices.  Plaintiffs are informed and believe, and on that basis allege, that Defendants will continue to engage in such practices to the irreparable harm of Plaintiffs unless these practices are enjoined by this Court pursuant to California Business and Professions Code section 17203.

## NINTH CLAIM FOR RELIEF

### Constructive Trust

68.    Plaintiffs incorporate by this reference each and every allegation of paragraphs 1 through 67 above.

69.    As a direct and proximate result of Defendants' wrongful actions as alleged herein, Defendants have been unjustly enriched in an amount to be determined at trial.  Among other things, Defendants have obtained profits from the sale of products that infringe upon the '345 Patent and the Marks.

- 12 -

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

70.    Plaintiffs are entitled to all such wrongfully acquired profits because Plaintiffs rightfully own all rights and interests in the '345 Patent and the Marks.

## TENTH CLAIM FOR RELIEF

### Declaratory Judgment

71.    Plaintiffs incorporate by this reference each and every allegation of paragraphs 1 through 70 above.

72.    An actual controversy has arisen and now exists between Plaintiffs and Clarke and PIC Glassware concerning their rights and duties under the Agreement.  Plaintiffs contend that Clarke and PIC Glassware have breached the Agreement and that, upon such breach, all rights, titles, and interests in the '345 Patent and the Marks immediately reverted to Carstens.  Clarke and PIC Glassware, on the other hand, continue to conduct business as if Clarke and PIC Glassware possess all rights, titles, and interests in the '345 Patent and the Marks.

73.    Plaintiffs desire a judicial determination of their rights and duties, and Clarke and PIC Glassware's rights and duties, with regard to the Agreement.  A judicial determination is necessary and appropriate at this time under the circumstances in order that Plaintiffs may promptly ascertain and protect their rights with regard to the '345 Patent and the Marks.

## PRAYER

WHEREFORE, Plaintiffs pray for the following relief:

1.    For a preliminary and permanent injunction against Defendants and any officers, agents, employees, or attorneys of Defendants, and all others in active concert or participation with them, restraining them from infringing the '345 Patent and the Marks;

2.    For a declaration that (a) Clarke and PIC Glassware breached the Agreement; (b) upon such breach, all right, title, and interest in the '345 Patent immediately reverted to Carstens; (c) upon such breach, all right, title, and interest in the Marks immediately reverted to Carstens; and (d) upon such breach, all right, title, and interest in all related technical data and confidential information immediately reverted to Carstens;

3.    For an order, pursuant to 15 U.S.C. § 1118, that all labels, signs, prints, packages, products, stationery, promotional materials, and advertisements in the possession of Defendants

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 13 -

1  bearing the "PH(X)" mark, including without limitation those incorporated within or affixed to

2  existing product inventory, and all plates, molds, matrices, and other means of making the same,

3  be delivered up and destroyed;

4       4.    For an accounting by Defendants of any and all profits derived from Defendants'

5  wrongful acts, and an award to Plaintiffs of such profits made by Defendants and the actual

6  damages suffered by Plaintiffs as a result of Defendants' unlawful conduct, in an amount to be

7  proven at trial, pursuant to 15 U.S.C § 1117(a) and 35 U.S.C. § 284;

8       5.    For an order declaring that Defendants hold all wrongfully acquired profits in trust

9  for Plaintiffs;

10       6.    For actual damages in an amount to be proven;

11       7.    For treble damages and enhanced profits on account of Defendants' willful,

12  deliberate, and bad faith conduct, pursuant to 15 U.S.C. § 1117(b) and 35 U.S.C. § 284;

13       8.    For punitive damages;

14       9.    For prejudgment interest at the maximum legal rate;

15       10.    For a determination by the Court that this is an exceptional case and that therefore

16  Plaintiffs should be awarded their costs and attorneys' fees incurred in bringing and prosecuting

17  this action, pursuant to 15 U.S.C § 1117(a), 35 U.S.C. § 285, and under California law;

18       11.    For any other damages or remedy to which Plaintiffs may be entitled, including all

19  remedies provided for in 15 U.S.C § 1117 and under California law; and

20       12.    For any such other and further relief as the Court may deem just and proper.

21

22  DATED:     June 12, 2008          SHARTSIS FRIESE LLP

23

24  By: _Joseph V. Mauch_____
             JOSEPH V. MAUCH

25         Attorneys for Plaintiffs

26         PH(X) GLASS, LLC and CHRISTOPHER
       CARSTENS

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 14 -

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 3-6, Plaintiffs PH(X) GLASS, LLC and CHRISTOPHER CARSTENS hereby demand a trial of this dispute by jury.

DATED:        June 12, 2008                          SHARTSIS FRIESE LLP

By:_____
        JOSEPH V. MAUCH

Attorneys for Plaintiffs
PH(X) GLASS, LLC and CHRISTOPHER
CARSTENS

7583\004\JMAUCH\1515952.1

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

- 15 -

Case No.            AMENDED COMPLAINT: PATENT INFRINGEMENT, TRADEMARK
INFRINGEMENT, UNFAIR COMPETITION, BREACH CONTRACT

**EXHIBIT A**

US006935345B2

(12) **United States Patent**      (10) Patent No.:      **US 6,935,345 B2**
Carstens et al.                     (45) Date of Patent:         Aug. 30, 2005

(54) **METHOD FOR GENERATING SMALL BUBBLES FOR A SMOKE-FILLED AIR STREAM**

(76) Inventors: **Christopher Carstens**, 1042 Tropic Ave., Santa Ana, CA (US) 92705; **Daniel Carstens**, 1042 Tropic Ave., Santa Ana, CA (US) 92705

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 236 days.

(21) Appl. No.: **10/377,417**

(22) Filed: **Feb. 28, 2003**

(65) **Prior Publication Data**

US 2003/0159701 A1 Aug. 28, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/360,319, filed on Feb. 28, 2002.

(51) Int. Cl.⁷ ................................................. A24F 1/30

(52) U.S. Cl. ..................... 131/173; 131/211; 131/212.1; 131/212.2; 128/200.24

(58) Field of Search ................................. 131/173, 200, 131/211, 212.1, 212.2, 216, 329; 128/200.24, 203.12, 203.16, 205.12, 205.27

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,241,741 A  * 12/1980  Cabados et al. ............ 131/173
4,357,948 A    11/1982  Schweitzer et al. ......... 131/173

* cited by examiner

*Primary Examiner*—Dionne A. Walls
(74) *Attorney, Agent, or Firm*—David T. Bracken

(57)      **ABSTRACT**

The present invention is a small bubble generator in a water stage cleaning and cooling a smoke filled air stream. A demister is a second embodiment of the invention to remove entrained water droplets from a cleaned and cooled smoke filled air stream issuing from the water stage.

16 Claims, 7 Drawing Sheets





FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4

FIGURE 5



FIGURE 6

FIGURE 7



FIGURE 8



FIGURE 9



FIGURE 10



FIGURE 11

FIGURE 12



FIGURE 13

US 6,935,345 B2

1

# METHOD FOR GENERATING SMALL BUBBLES FOR A SMOKE-FILLED AIR STREAM

This application claims the benefit of Ser. No. 60/360, 319 filed Feb. 28, 2002.

## BACKGROUND OF THE INVENTION

The present invention relates to water pipes using more than a single stage of water to condition smoke before it reaches the user's mouth.

U.S. Pat. No. 4,357,948 shows a water pipe with a device located in a tube above a bottom water reservoir. The device can only form large and non-uniform bubbles from smoke filled air passing through water retained in the device. The device loses almost all effectiveness when tilting it more than a few degrees from vertical, as a relatively low water head at one side of the tube allows all the smoke filled air to escape through the water at the point where the depth is smallest.

## SUMMARY OF THE INVENTION

A first embodiment of the invention is a small bubble generator system for smoke filled air generated from in a pipe and drawn by vacuum force of human lungs through a water stage. The first embodiment preferably processes the smoke filled air after contact in large bubbles with a main body of water. The main body of water may be the lowest bowl or container of water in a prior art water pipe.

A small bubble generator by the invention process has proven to have resulted in a dramatically more pleasurable smoking experience for the user. The reasons for this improvement are clear in retrospect after the inventors experimented with several alternate methods.

Smoke filled air drawn from a pipe bowl or from another source of burning vegetable matter is hot and filled with microscopic particles comprising carbon, tars, partly burned vegetable matter fibers, dirt and dust, and other non-volatiles, as well as vaporized hydrocarbons, pesticides, carbon dioxide, carbon monoxide, and typical components for reduced oxygen air. The components of smoke that are desired by the user are typically a complex mixture of hydrocarbons and a sometimes a portion of the particulates.

Excluding the desirable components, the balance of the components are undesirable and typically unhealthy. A user would prefer to exclude at least some of the undesirable components. In addition, a typical user has been found to prefer a lower temperature smoke filled air stream to draw into their lungs, albeit a stream sufficiently high in the desirable components to provide the smoking experience desired. In this application, the phrase "first smoke stream" will refer to a smoke filled air stream drawn directly from a pipe bowl or from another source of burning vegetable matter by vacuum force of only human lung power.

Conventional water pipes capture some of the undesirable components of the first smoke stream and cool the stream some few degrees. This is done by drawing that first smoke stream to a bottom of a lower bowl of water to form in the water relatively large bubbles that rise through the water. A relatively large gas space is provided above the water for disengaging water droplets from the released bubbles. The diffusers in that lowest bowl for the first smoke stream are commonly just glass or metal tubes that run from a pipe bottom to an end under the water, where the first smoke stream exits the tube through a few holes. The bubbles

2

exiting those holes have an average inside diameter of about 3 millimeters or more.

The inventors have found that reducing the average inside diameter of the bubbles to about 2 millimeters or less in one or more water stage upstream of a user dramatically reduces the emerging gas temperature and removes substantially more of undesirable smoke components that prior art devices. However, making small bubbles in a smoke filled gas stream has an important cost.

Making a gas stream to pass through a small hole is the best way to make a small bubble. A gas stream with particulates and tars will eventually plug that hole. That is the cost of making small bubbles for water pipes.

The present inventors attempted replacing the holes in the end of the glass or metal tube in a water pipe with a sintered "stone" used in aquariums to generate small bubbles. The device worked well to make small bubbles but had a very short life. The small passages of the stone plugged and could not be cleaned. The present inventors then experimented with several alternate structures to arrive at the first embodiment of the invention. The first embodiment accelerates a smoke filled gas stream to impinge on an underside of a top cap and then down from the top cap to small accelerator openings that emit the smoke filled gas as small bubbles into a volume of water. The pressure drop of the gas across the accelerator openings that is substantially greater than the pressure drop through the water the bubbles encounter on the water stage. This means a user may tilt the invention water stage to 45 degrees or more with little, if any, reduction in desired performance.

A second embodiment of the invention is a mist eliminator. The act of drawing smoke filled air through water with inhalation vacuum of a human typically generates substantial water droplets carrying upward from the surface of the water. However, prior art water pipes have been designed with very substantial upward extensions of the enclosure above the lowest bowl of water and/or expanded lateral cross sections above the water so that the water droplets from that lowest bowl of water do not reach the user's mouth. tubes very extended When a water stage is placed somewhat nearer the user's mouth than the water level of water in a lowest bowl or container of water in a prior art water pipe, a sensible and annoying amount of water droplets get pulled into a user's lungs. The second embodiment is similar to the first embodiment but eliminates a central tube with an annular space within the structure of the top cap. The droplet laden gas stream impinges on an underside of that structure and is forced through elevated side slots to impinge on the inside surface of the largest bore of the outside housing. The droplets adhere to one of those impingement surfaces and drain to a water stage below the second embodiment.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is side and cutaway view of a lower water reservoir with two embodiments of invention stages shown above it.

FIG. 2 is a close up of section 122 of FIG. 1.

FIG. 3 is cross section 109 of FIG. 1.

FIG. 4 is an operational view of FIG. 2 in an upright position.

FIG. 5 is an operational view of FIG. 2 in a tilted position.

FIG. 6 is a close up of section 119 of FIG. 1.

FIG. 7 is an operational view of FIG. 6 in an upright position.

FIG. 8 is cross section 113 of FIG. 1.

US 6,935,345 B2

3

FIG. 9 is cross section 144 of FIG. 6.

FIG. 10 is cross section 144 of FIG. 6 with an alternate slot form.

FIG. 11 is an axial cross section view similar to FIG. 4 with another form of the first embodiment.

FIG. 12 is an axial cross section view similar to FIG. 4 with another form of the first embodiment.

FIG. 13 is an axial cross section view similar to FIG. 4 with another form of the first embodiment.

## DETAILED DESCRIPTION OF THE INVENTION

The invention is now discussed with reference to the figures.

FIG. 1 shows a water pipe 100 with the two invention stages 109 and 113. Additional upwardly sequential stages 109 and 113 can be stacked on the stages shown so that housing 118 with the central bore extends upward to accommodate those stages. Stage 109 is an invention water stage of the first embodiment. Stage 113 is an invention demister stage of the second embodiment. Each of stages 109 and 113 can operate independently of each other. Stage 109 may be primary water stage processing a first smoke stream or may process smoke filled air streams downstream of other processing stages. Stage 113 may act as a demister without the previous process of smoke filled gas accomplished on stage 109. Stage 113 can remove water droplets from smoke filled air from a water stage such as that shown in FIG. 1 in container 129.

Container 129 in FIG. 1 is preferably a glass or other water containing container that can retain a water volume 101. Pipe bowl 128 retains burning vegetable matter, and a first smoke stream 103 is drawn from bowl 128 through tube 102 through diffuser end 127. Stream 103 issues from diffuser end 127 as bubbles greater than about 3 millimeters in water volume 101 to form bubble stream 104. The bubbles of stream 104 burst and form second smoke stream 105, which in turn flows to opening 125 at the base of housing 118. Stream 105 passes through opening 125 and into stage 109, wherefrom a third smoke stream passes to stage 113. After the third smoke stream is processed in stage 113, it emerges as a fourth smoke stream from a top end of housing 118 to be drawn into a user's mouth and lungs.

With reference to FIGS. 1–5, stage 109 comprises a portion of housing 118 and its central bore. To an inside wall of the central bore is sealed floor plate 107. Plate 107 defines an opening 106, from which extends upward a tube 123 that ends in opening 132. A preferred inside diameter of tube 123 is from about 5 to about 20 millimeters and a more preferred inside diameter is from about 10 to 14 millimeters. Enclosing tube 123 is a structure comprising a top cap 133 extending down to side walls 110, at whose base are located small accelerator holes 157. Holes 157 in a first embodiment are rectangular extending from a top of floor 107 up to a height of from about 0.5 to about 4.5 millimeters and a width of from about 0.5 to 5.5 millimeters with a hydraulic cross section area of about from 1–10 square millimeters, and more preferably from about 2–4 square millimeters.

An inside surface of housing 118 and an outside surface of walls 110 define annular space 108. An inside surface of walls 110 and outside walls of tube 123 define annular space 124. The sole connection fluid conduit connections between space 108 and 124 are holes 157. Space 108 opens to an open area within housing 118 above cap 133. An alternate embodiment of holes 157 are shown in FIG. 3. Holes 134

4

comprise extensions so that fluid exiting space 124 to space 108 is forced into a tangential or other angled relationship to the straight through orientation of holes 157. Holes 134 result in fluid direction 135 as fluid is drawn from space 124 to space 108. Holes 157 result in fluid direction 136 as fluid is drawn from space 124 to space 108. A preferred clearance between the top of tube 123 and the topmost part of the underside of cap 133 is about 0.25 to 2 inches. Generally, the small openings may direct gas flow radially, tangentially or at any other angle with respect to the outside surface of the wall defining the small opening.

The operational FIGS. 4 and 5 are now referred to with respect to the invention process for the first embodiment. Second smoke stream 105 is drawn by vacuum force of human lungs into opening 106 from the much wider cross section below it defined by the inside walls of housing 118. This dramatically increases the velocity of stream 105. Stream 105 passes through tube 123 to impinge on the underside of cap 133, causing substantial turbulence and swirling. From cap 133, stream 105 is drawn down through space 124 to holes 157. The cumulative hydraulic cross section area of all of holes 157 is preferably much less than that of space 124 so that stream 105 passing through those holes 157 in one form of the invention experience a substantial acceleration. Stream 105 then passes into liquid 140 and liquid 141 (preferably water), liquids 140 and 141 being located on substantially opposite sides of space 108. Liquids 140 and 141 remain outside of space 124 by action of stream 105 passing into them, although when stream 105 is not flowing, liquid may flow into that space 124. If the level of liquids 140 and 141 are too high when stream 105 is not flowing, excess liquid spills into tube 123 and down to a next water stage. Water added from above stage 109 can spill into space 108 and will thereby only rise to the level of the top of tube 123. This is a method of adding water needed for operation of the invention water stages.

Bubbles 158 in FIGS. 4 and 5 have an average internal diameter of from about 0.5 millimeters to about 2 millimeters. A feature of the invention process is found in the acceleration of stream 105 through the small accelerator holes. Bubbles 158 move initially after formation from stream 105 in directions 136 or 135 shown in FIG. 3. When acceleration is substantial, this forces small bubbles into intimate contact with the inside wall of housing 118, where electrostatic attraction for a glass or metal surface causes the bubbles to frictionally resist rising as if open water. This increased residence time improves heat and mass transfer between the bubbles and the liquids 140 and 141. Thus, more undesirable components are removed and the temperature is reduced by humidification of the gas in the bubble.

FIG. 5 shows that the first embodiment is very adaptable to tilting, an activity that lets a user move about with the device 100. In FIG. 5, liquid 140 has a much reduced liquid pressure head compared with that shown in FIG. 4 and even much less than that of liquid 141 of FIG. 5. In prior art devices, stream 105 would necessarily flow almost entirely through fluid passages to the shallow liquid 140 side because the pressure drop has been reduced. In the first embodiment, the pressure drop across holes 157 is so substantial that the change in liquid head height has little effect on the operation of reducing temperature and removing undesirable components. In FIG. 5, it can be appreciated that the bubbles 158 of liquid 140 have a short residence time in the water or liquid, where the bubbles 158 of liquid 141 have a relatively long residence time in the water or liquid. So, where in FIG. 5 about half of all the bubbles would be less treated in liquid 140, the other half would be over treated in liquid 141. The

US 6,935,345 B2

| 5 | 6 |

invention uses small holes for bubble generation around a lower part of a periphery of a shell with a relatively large outside diameter. The result is even distribution of smoke filled air flow among the holes to that periphery so that substantially the entire volume of water or other liquid is in close contact with smoke filled bubbles. The prior art does not disclose such an efficient device as the invention.

FIGS. 7–9 are a second embodiment of the invention. FIG. 7 shows that a floor 112 seals to the inside surface of the largest bore of housing 118. Floor 112 defines opening 111 that opens to a space 145 defined by cap 146 (similar in structure and function to cap 133) and walls 142. Openings 114 communicate between space 145 and annular space 153 between the inside walls of the largest bore of housing 118 and the outside surface of walls 142. Slots 117 are formed about an inch or more below the top of cap 146 and at about a transition from walls 142 to cap 146 and are supported at sections 148 (shown in FIG. 8). The operation of the demister is shown in FIG. 7. Water droplets are carried up by a third smoke filled gas stream 150 through opening 111 into space 145. Droplets 152 impinge on an underside of cap 146, adhere thereon and drain down walls 142 to opening 111 where water flow 143 drains to a water stage below. Droplets 160 are drawn through slots 117 and impinge on the inside walls of the largest bore of the housing where they adhere and drain in film 161 to flow 157 through openings 114.

The second embodiment, with vane slots 117a of FIG. 10, surprisingly causes stream 150 being drawn through vane slots 117 to be forced into an especially pleasing spiral pattern in space 153 in paths 156a (in FIG. 7) and 163a (in FIG. 10). Streams 156, 156a and 156b leave space 147 conditioned to be inhaled by a user.

FIGS. 11, 12 and 13 are alternate forms of the first embodiment. FIGS. 11, 12 and 13 respectively show small bubble generating stages 170, 179 and 197. Each respectively has a housing bore-sealing floor 171, 180 and 107. FIG. 11 shows that opening 172 in floor 171 extends to an upside down U-tube 173 that extends above the level of liquid 176 and back into liquid 176 to end part 174 that has small openings 175 with the bubble generating capabilities of the several first embodiments. Stream 105 passes through tube 173 on path 177 to form bubbles 198, which are released from the liquid 176 to form stream 178. The form of FIG. 11 somewhat reduces the fabrication costs, although the requisite narrow tube 173 will typically cause the bubbles 198 to pass through only a relatively small portion of liquid 176.

The form of FIG. 12 improves the liquid distribution of bubbles 187 in liquid 186 contained in container 181. Container 181 is a downward extension of a large opening in floor 108, which is sealed to the inside bore of housing 118. A tube 183 extends from an upper opening 182 in the side wall of container 181 down into liquid 186 to a flared end 184 that comprises the invention small openings in a periphery of end 184. Stream 105 enters stage 179 and along path 199 is drawn into an annular space between the outside walls of container 181 and the inside of the bore of housing 118, thereafter into tube 183 and out the small openings into liquid 186 to form bubbles 187. Bubbles 187 are freed from liquid 186 to form stream 188.

The form of FIG. 13 as stage 197 is similar to the form of FIG. 4, except that wall 190 is extended laterally at floor 192 to sealingly connect with the inside bore of housing 118. A space is formed between the upper surface of floor 107 and the underside of floor 191, in which are formed the invention small openings 192. Stream 105 is drawn into stage 197

along path 193, into tube 123 and then into the annular space between the outside of tube 123 and the inside of cap 189 that extends down to walls 190. Bubbles 196 are formed in liquid 195 as the smoke filled gas is drawn through openings 192, which are then released to form stream 194.

It is an especially important feature of the embodiments that they are easily cleaned with an alcohol and salt solution. It preferred that at least two successive first embodiment water stages are used above the first water contact of the first smoke stream of FIG. 1.

It will be seen that the forms of the first embodiment provide that the small openings may be located in a lower or lowest edge of a conduit which is immersed in the filtering liquid.

The above design options will sometimes present the skilled designer with considerable and wide ranges from which to choose appropriate apparatus and method modifications for the above examples. However, the objects of the present invention will still be obtained by that skilled designer applying such design options in an appropriate manner.

We claim:

1. A method for generating small bubbles for a smoke filled air stream, where the smoke filled air stream is generated by human inhalation of air through burning vegetable matter causing the smoke filled air stream to be drawn through an intervening water stage, comprising:

(a) generating the smoke filled air stream;

(b) drawing the smoke filled air stream into a lower opening of a largest bore of an outer housing, the bore having a longitudinal axis from the lower opening to an upper opening, whereto human inhalation vacuum force is applied as the sole force for generating the smoke filled air stream;

(c) providing a first plate that seals the bore except for a first opening in the first plate about the bore axis and also providing an open ended tube extending from the edges of the first opening along the bore axis to a first height, whereby the smoke filled air stream flows from the first opening through the open ended tube to a second opening at the first height;

(d) providing an enclosure for the open ended tube with a cap on top of walls that extend up from a top surface of the plate to define a first annular space between an outside surface of the tube and an inside surface of the walls and a second annular space between an outside surface of the walls and an inside surface of the bore, where small accelerator openings are provided at a lower part of the walls between the first and second annular spaces;

(e) providing a water based liquid in the second annular space and flowing the smoke filled air stream from the second opening of the tube through the first annular space, substantially accelerating the smoke filled air stream by flowing it through the small accelerator openings and forming small bubbles therewith in the water based liquid; and

(f) flowing the small bubbles to a surface of the water based liquid and thereby reducing the temperature of the smoke filled air and capturing a substantial portion of its undesirable components to form a first cleaned smoke stream.

2. The method of claim 1 wherein the top of the tube and an underside of the cap are separated by 0.25 to about 2 inches.

3. The method of claim 2 wherein the small accelerator openings have a hydraulic cross section of about 10 square millimeters or less.

US 6,935,345 B2

7

8

4. The method of claim 2 wherein the small accelerator openings have a hydraulic cross section of about 4 square millimeters or less.

5. The method of claim 2 wherein the small accelerator openings have a hydraulic cross section of about 2 square millimeters or less.

6. The method of claim 1 wherein the small bubbles have an average internal diameter of about 4 millimeters or less.

7. The method of claim 1 wherein the small bubbles have an average internal diameter of about 2 millimeters or less.

8. The method of claim 1 wherein the system steps (b), (c), (d), (e) and (f) comprise a first water stage.

9. The method of claim 8 wherein the first cleaned smoke stream is fed as a smoke filled air stream to a second water stage to repeat the system steps (b), (c), (d), (e) and (f) to form a second cleaned smoke stream.

10. The method of claim 9 wherein the second cleaned smoke stream is fed as a smoke filled air stream to a third water stage to repeat the system steps (b), (c), (d), (e) and (f) to form a third cleaned smoke stream.

11. The method of claim 1 wherein the outer housing is substantially tilted away from vertical so that a side of the second annular space in the tilt direction contains substantially more water based liquid than an opposite side of the second annular space, whereafter about the same gas stream flow is maintained through the small accelerator openings as compared with the gas stream flow while the outer housing is vertical.

12. The method of claim 1 wherein the first cleaned smoke stream comprises a substantial amount of water droplets and is flowed to a demister in the bore to substantially eliminate the water droplets to form a demisted smoke stream.

13. The method of claim 12 wherein the demister provides a second plate that seals the bore except for a second opening in the second plate about the bore axis and also providing an enclosure for the second opening a demister cap on top of demister walls that extend up from a top surface of the second plate to define a demisting space and a third annular space between an outside surface of the demister walls and an inside surface of the bore, where demister openings are provided at a lowest part of the walls between the demister space and the third annular space and one or more slots radial to the bore axis are formed in the demister walls between the demister space and the third annular space.

14. The method of claim 13 wherein the first cleaned smoke stream flows into the demister space and water droplets adhere to a bottom surface of the demister cap.

15. The method of claim 14 wherein the first cleaned smoke stream flows into the demister space and out through the slots to water droplets on the inside surface of the bore.

16. The method of claim 15 wherein water drains through the demister openings to the second opening and then down to a water stage.

* * * * *

**EXHIBIT B**

# Technology and Patent Rights Sale Agreement

This Agreement is effective June 1, 2005 (the "Effective Date"), by and between Christopher Carstens, an individual with a residence in Santa Ana, California ("Owner") and PIC Glassware, Inc. (hereinafter "Purchaser"), a Canadian corporation, having a principal office located at 191 Hatt St. Dundas ON, Canada L9H 2G7 and Roland Clarke, an individual with a residence in 191 Hatt St., Dundas ON, Canada L9H 2G7 (hereinafter together referred to as "Purchaser").

WHEREAS Owner owns all the rights, titles and interests in certain confidential information, trade secrets, technology, designs, technical data, and patent and trademark rights relating to low pressure drop air bubble dispersion devices; and

WHEREAS Purchaser desires to purchase and own in entirety all of said rights, titles and interests in Owner's confidential information, trade secrets, technology, designs, technical data, and patent and trademark rights relating to a low pressure drop air bubble dispersion devices;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for the mutual obligations and premises herein contained, the parties hereto hereby agree as follows:

1.0    DEFINITIONS

1.1    "Patent Rights" shall mean the application for a United States Letters Patent Serial No. 10/377,417, filed 2/28/2003 (Title: Small bubble generator for smoking apparatus; Inventor: Christopher Carstens; Claims benefit of Serial No. 60/360,319 filed 2/28/2002) and any patent issuing therefrom, any corresponding foreign patent applications and/or patents and/or related U.S. patent applications or patents, including without limitation divisionals, continuations, continuations in part. Owner owns all the rights, titles and interests in this patent application. Owner has received a notice from the United States Patent and Trademark Office that claims pending in this application have been allowed.

1.2    "Trademark Rights" shall mean all the trademark rights and goodwill arising under or accruing to Owner under common law and state and federal laws from Owner's use on goods incorporating Owner's low pressure drop air bubble dispersion devices under the trademark "PHX" and/or the following design mark:



Trademark Rights include ownership and control of the Internet website with the address of "www.phxglass.com".

Technology and Patent Sale Agreement

1.3    "Technology" shall mean all engineering, specifications, designs, technical data, test results, and other technical information related to the conception, development, construction and production of products incorporating Owner's low pressure drop air bubble dispersion devices, whether or not such technical information comprises trade secrets or confidential information or patented technology.

1.4    "Confidential Information" means all Technology, business development information, customer lists, and other information in possession or control of Owner related to Owner's low pressure drop air bubble dispersion devices which is not known to the public and which has value in the production or sale of products incorporating such information.

2.0    PURCHASE TERMS

2.1    Scope of Purchase. Subject to the exceptions below related to transfer of the "Patent Rights" until after issuance of a United States Letters Patent thereunder, Owner hereby transfers, delivers and sets over to Purchaser, jointly, all Owner's rights, titles and interests in and to the Patent Rights, the Trademark Rights (including all of Owner's goodwill accrued thereunder), the Technology, and the Confidential Information. Owner shall execute at Purchaser's expense all documents required by Purchaser to transfer such rights, titles and interests to Purchaser. Owner shall deliver to Purchaser all documents relating to the Trademark Rights, the Technology, and the Confidential Information within 30 days from the effective date of this Agreement. Owner shall deliver to Purchaser all documents relating to the Patent Rights within 30 days from the issuance of a patent thereon, although Owner shall deliver to Purchaser a copy of the application now pending with the USPTO within 30 days of the effective date of this Agreement.

2.2    Delay of Transfer of Patent Rights. At the effective date of this Agreement, claims have been allowed in the Patent Rights in the USPTO. Owner is in a superior and more efficient position to take steps necessary to seek issuance and pay issue costs for a Letters Patent on the Patent Rights and retains all rights, titles and interests in the Patent Rights until such time as such a patent issues. Until such time, Purchaser is granted a paid-up, royalty free, and exclusive license under the Patent Rights to make, use, offer to sell or sell products incorporating the concepts there under.

2.3    Consideration. Jointly and severally, Purchaser is obligated hereunder to deliver to Owner one hundred and fifty monthly payments, each in the minimum amount of $10,000.00 USD, from the effective date of this Agreement until Owner has received from Purchaser the total amount of $1,500,000 USD. The first monthly payment of $10,000.00 USD is due within 30 days of the effective date of this Agreement. Each subsequent monthly payment must be delivered to Owner by the first day of the month following the previous monthly payment. Payments that are

Technology and Patent Sale Agreement

overdue may be accepted by Owner without waiving any rights to receive subsequent monthly payments on time. Payments that are overdue by more than 30 days overdue and are accepted at the discretion of the Owner shall be delivered with an additional payment equal to the 1.5% per month. Unless specifically accepted by Owner, any overdue payments under this Agreement constitute an immediate and material breach of the Agreement by Purchaser. Each monthly payment under this Agreement shall be delivered to Owner at the following address or such address as indicated later by the Owner in a written notice to Purchaser:

Owner Payment Delivery Address:
1109A Woodland Ave
Menlo Park, CA 94025

2.4    Non-competition. For the term of this Agreement, Owner shall not engage in any acts, directly or indirectly, which would in any manner interfere with or cause competition with Purchaser in the field of devices incorporating any of the concepts embodied in the Patent Rights, Trademark Rights, Technology or Confidential Information.

## 3.0    TERM AND TERMINATION

3.1    Term. This agreement shall remain in force unless terminated by breach by Purchaser.

3.2    Termination By Purchaser's Breach. If Purchaser shall fail to deliver on time any of the monthly payments required hereunder, this Agreement shall terminate and all rights, titles, and interests in Patent Rights, Trademark Rights, Technology, and Confidential Information shall immediately revert to, transfer to and shall be delivered to Owner without further action by Owner. Owner shall immediately cease use, offers to sell, manufacture, distribution, presentation or sale of all products and materials incorporating in any manner the Patent Rights, Trademark Rights, Technology, or Confidential Information. Purchaser shall after termination of this Agreement, at Purchaser's expense, execute all documents required by Owner to perfect Owner's rights, titles, and interests in Patent Rights, Trademark Rights, Technology, and Confidential Information. This Agreement shall not automatically terminate under the terms of this paragraph unless Purchaser has notified Owner of Purchaser's intent to fail to deliver a monthly payment on time and Purchaser and Owner have entered into a written agreement extending the date for delivery of said monthly payment.

3.3    Delivery of Unpaid Monthly Payments Upon Termination. Upon termination of this Agreement, Purchaser shall deliver monthly payments that have accrued as unpaid under this Agreement within 15 days from that date of termination.

Technology and Patent Sale Agreement

    3.4    Disposition of Products or Materials Incorporating in any manner the Patent Rights, Trademark Rights, Technology, or Confidential Information upon Termination. If this Agreement is terminated in accordance with Section 3.1 of this Agreement, Owner shall have the option, at Owner's discretion, to purchase all products and materials incorporating in any manner the Patent Rights, Trademark Rights, Technology, or Confidential Information at their original acquisition cost.

4.0    MANUFACTURE, DISTRIBUTION AND SALES

    4.1    Manufacture, Distribution and Sales. Purchaser shall be solely responsible for the manufacture, distribution and sale of any products and materials incorporating in any manner the Patent Rights, Trademark Rights, Technology, or Confidential Information. Purchaser shall be solely responsible for any claims of injury or liability arising from such design, manufacture, distribution and sale of any products and materials incorporating in any manner the Patent Rights, Trademark Rights, Technology, or Confidential Information hereunder. Purchaser shall carry products liability insurance in amount reasonable and customary in the trade.

    4.2    Licenses Or Approvals. To the extent necessary or customary to obtain any required license, approval, certificate, registration or other statutory or regulatory approval required by any Federal, state or local agency or governmental authority to manufacture, distribute or sell the Licensed Product(s), Purchaser agrees to expend reasonable effort to obtain such approvals. Purchaser shall be responsible for all costs associated with obtaining such approvals.

    4.3    Purchaser, jointly and severally, shall indemnify, defend and shall hold Owner harmless against any claims, liabilities, losses, demands, suits, damages and expenses, including without limitation, reasonable attorney fees and expenses, and liabilities of whatsoever kind or nature imposed on, incurred by or that may be asserted against Owner in connection with or arising out of the performance, safety, manufacture, offer for sale, sale, or use of products incorporating any of the Patent Rights, Trademark Rights, Technology, or Confidential Information hereunder after the effective date of this Agreement.

5.0    MISCELLANEOUS

    5.1    Notice. All notices, statements, reports and approvals required or permitted to be given hereunder shall be given in writing in the English language and shall be deemed to have been given upon delivery in person or upon the expiration of ten (10) days after deposit in a lawful mail depository, first class postage prepaid and addressed to the other party at the address specified below. Either party may change its address by giving notice as provided herein.

Technology and Patent Sale Agreement

Purchaser:    _____

             _____

             _____

    Attn:

Owner:       _____

             _____

             _____

5.3    Severability. All rights and restrictions contained herein may be exercised and shall
       be applicable and binding only to the extent, that they do not violate, any applicable
       laws and are intended to be limited to the extent necessary so that they will not
       render this Agreement illegal, invalid or unenforceable. If any provision or portion of
       any provision of this Agreement not essential to the commercial purpose of this
       Agreement shall be held to be illegal, invalid or unenforceable by a court of
       competent jurisdiction, it is the intention of the parties that the remaining provisions
       or portions thereof shall constitute their agreement with respect to the subject matter
       hereof, and all such remaining provisions or portions thereof shall remain in full
       force and effect. To the extent legally permissible, any illegal, invalid or unen-
       forceable provision of this Agreement shall be replaced by a valid provision which
       will implement the commercial purpose of the illegal, invalid or unenforceable
       provision. In the event that any provision essential to the commercial purpose of this
       Agreement is held to be illegal, invalid or unenforceable and cannot be replaced by a
       valid provision which will implement the commercial purpose of this Agreement,
       this Agreement and the rights granted herein shall terminate.

5.4    Choice of Law. The validity and effect of this Agreement shall be governed by and
       construed and enforced in accordance with the internal laws of the State of
       California, United States of America (without regard to the principles of conflict of
       laws of such State).

5.5    Jurisdiction. Any and all disputes arising out of or in connection with the negotiation,
       execution, interpretation, performance or nonperformance of this Agreement shall be
       resolved with resort solely to the courts of the State of California. The parties agree
       that the courts of the State of California shall have sole and exclusive jurisdiction of
       all such disputes and Purchaser expressly consents to the personal jurisdiction of
       such Courts.

5.6    Assignability. Except as provided in the following sentence, neither party shall
       assign or delegate this Agreement or any of its rights, duties, or obligations arising
       hereunder to any other person or entity whatsoever without the prior express written
       consent of the other party, which consent shall not be unreasonably withheld.

Technology and Patent Sale Agreement

5.7     Headings and Paragraph Numbers. The headings as to contents of particular paragraphs are inserted only for convenience and shall not be construed as part of this Agreement or as a limitation on the scope of any terms or provisions of this Agreement.

5.8     Entire Agreement - This Agreement constitutes the entire agreement between Owner and Purchaser with respect to the Subject matter of this Agreement and shall not be modified, amended or terminated except as herein provided or except by another agreement in writing executed by the parties hereto.  Any further agreements or amendments which change, affect or impact the terms and conditions hereof shall be attached hereto as Exhibits upon their execution.

Technology and Patent Sale Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the dates indicated below.

**PURCHASER**                                        **OWNER**

PIC Glassware , Inc.

By: _____            _____
Roland M Clarke, President                    Christopher Carstens, as an individual

Date: _June 10 /2005_                          Date: _____

By: _____
Roland M Clarke, as an individual

Date: _June 10 , 2005_

Technology and Patent Sale Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the dates indicated below.

PURCHASER                                           OWNER

    PIC Glassware , Inc.

By: _____          _____
    Roland M Clarke, President              Christopher Carstens, as an individual

Date: _____ .        Date: _____8/8/05_____



By: _____
    Roland M Clarke, as an individual

Date: _____

**EXHIBIT C**



**SHARTSIS FRIESE LLP**

One Maritime Plaza • Eighteenth Floor
San Francisco, California 94111-3598

James P. Martin
jmartin@sflaw.com

February 29, 2008

_**VIA MESSENGER AND UPS**_

Mr. Roland Clarke
PIC Glassware, Inc.
1820A Encinal Ave.
Alameda, CA 94501

      Re:    Breach of Technology and Patent Rights Sale Agreement

Dear Mr. Clarke:

      We represent Christopher Carstens and PH(X) Glass, LLC. We are writing with respect to your breach of the June 1, 2005 Technology and Patent Rights Sale Agreement (the "Agreement"), which automatically terminated as a result of your breach of the Agreement.

      As you know, pursuant to Section 2.3 of the Agreement you were obligated to deliver to Carstens one hundred fifty monthly payments, each in the minimum amount of $10,000.00 USD, from the Effective Date of the Agreement until Carstens had received from you the total amount of $1,500,000 USD. The first monthly payment was due on July 1, 2005. Each subsequent monthly payment was required to be delivered to Carstens by the first day of the month following the previous monthly payment. As you know, you have failed to pay Carstens the amounts due under the Agreement. Pursuant to the express terms of Section 2.3, your failure to pay the amounts due constituted an immediate and material breach of the Agreement.

      Pursuant to Section 3.2 of the Agreement, all rights, titles, and interests in the Patent Rights, Trademark Rights, Technology, and Confidential Information (all defined in the Agreement) shall have immediately reverted to Carstens without any further action by Carstens following the automatic termination. Although we do not believe that we will require your assistance in executing any documents as contemplated in Section 3.2 to perfect our clients' interests in the Patent Rights or Trademark Rights, we will contact you if that assessment changes. Through this letter, however, we ask you to confirm in writing immediately that you will immediately cease and desist from any further use of any of the Patent Rights, Trademark Rights, Technology, and Confidential Information. Through this letter, we also request that you identify and provide us immediately with an inventory of any and all products and materials incorporating in any manner the Patent Rights, Trademark Rights, Technology or Confidential Information.

Mr. Roland Clarke
February 29, 2008
Page 2

We are currently in the process of evaluating our clients' other rights and remedies pursuant to the Agreement, all of which are expressly reserved. Among other things, Carstens is entitled to contractual damages and a monetary recovery based on your post-termination use of the Patent Rights, Trademark Rights, Technology and Confidential Information, including, without limitation, a disgorgement of any revenues or profits associated with your sales of products following the date of the automatic termination of the Agreement. If you disagree with that understanding, please inform us immediately.

We request that you contact us by letter or email at the address set forth above by no later than March 17, 2008. We are also willing to speak with your legal counsel, who can contact me or my colleague, Joe Mauch. We look forward to your prompt response.

Best regards,

James P. Martin

JPM:smb

cc:    Joe Mauch, Esq.
       Christopher Carstens
       David Marglin

7583\001\JMARTIN\1477115.1

**EXHIBIT D**

March 3rd, 2008

*VIA MESSENGER AND USPS*

James P. Martin,

Re: Misconceptions within Shartsis and Friese LLP Letter dated February 29th, 2008

Dear Sir or Madam:

It seems that you and your firm may be operating under a relatively large misconception. This is a misconception that we would be only happy to clear up for your firm immediately. The only self contained and at-any-time valid written agreements that were ever in force between myself and Mr. Carstens, and for which consideration on both sides was given does not contain Sections 2.3 and 3.2 as you describe. Please note that without further production of this and other supporting documents, it would be obvious to any third party that none of the described consequences in the letter by your firm dated the 29th of February would be logically reasonable or enforceable or to have any legitimate merit. Our claim can be substantiated by an extensive record of emails and phone conversations between Mr. Carstens, myself and others. It can also be substantiated by an extensive series of emails and verbal communications involving a Mr. Peter Kazanjy, Mr. Patrick Mellody, Mr. Jon Myers and others who would serve as excellent witnesses. Many of these third parties were responsible for authoring these other valid agreements and they can and should be contacted by your firm regarding these matters of contractual dealings between myself and Mr. Carstens and others. It is our suspicion Mr. Carstens has misled you as to the extent and details of his previous business dealings. It is also possible that Mr. Carstens may have misled you with regard to accurate descriptions of any business dealings of ours with any other parties. This, if true, would not surprise us, nor would it deter us from executing any and all reasonable efforts that will be necessary in the coming time to clear up any and all possible misunderstandings with regard to this and any other matter that may be before you at the present time.

To the extent that it may interest your firm in the possible determination of the truthfulness and/or validity of any and all claims presented to your firm by Mr. Carstens, we have an extensive collection of evidence compiled in the past years regarding the penchant of Mr. Carstens to dissemble, to Palo Alto Police Officer Anjanette Holler, Mr. Peter Kazanjy, and others, and would love to discuss this at length with your firm. In response to a fraudulent claim by Mr. Carstens and/or his wife to the Palo Alto Police toward Roland Clarke, we provided Officer Holler with evidence of Mr. Carstens attempting to forge checks under the name of Roland Clarke, and the reckless endangerment of persons by the abuse and illegal transport of a large pressurized hydrogen gas cylinder. Additional fraudulent behavior known by us to be perpetrated by Mr. Carstens and/or his wife are an attempt to forge tax documents under the name of Roland Clarke, and a fraudulent loan for a property in Woodside worth in excess of $1M – land on which we believe they both presently reside. It is our suspicion that this document now being referred to by your firm as "The Agreement" may have been used, in addition to other fraudulent information, to obtain this loan. These original loan documents

should be easily obtainable by your client and should quickly corroborate or dispel this possible fraudulent activity. We are confident that the statute of limitations on this magnitude of fraud has surely not expired. These are just a few of the fraudulent activities that were either directly witnessed by Roland Clarke and others, or activities that may be proven with documentary evidence that is now our possession. Several threats to the physical safety of Roland Clarke have been made by Mr. Carstens in both emails and in person. In addition, we have documented evidence that Mr. Carstens was guilty of stealing funds from an organization that he, Mr. Kazanjy, and Dr. Clarke were a part. This and other activities resulted in many tens of thousands of dollars in damage to the organization that has not been repaid. These extensive and habitual fraudulent activities were the primary cause of Dr. Clarke extricating himself from any personal and business relationships with Mr. Carstens some time ago.

It is not our present wish to pursue a civil suit with regard to these illegal activities. We are merely using these incidents as an example of past malfeasances and the lack of credibility of any statements by this character by the name of Christopher Carstens.

Thankfully, we look forward to these coming cordial discussions with gusto and all reasonable cooperativeness.

In this light, we will pen some important further inquisitory text for you and your associates regarding your letter of February 29th, 2008:

If you feel that we may be in error with regard to the statement presented in paragraph one of our current letter regarding these agreements and/or "Agreement", please provide us with a copy of the object to which you are referring (so previously described by your firm as "The Agreement" that may or not be accurately named as such an animal) that it is being claimed to contain such a Section 2.3 and/or Section 3.2 as so described in your letter of February 29th, 2008, and perhaps we may begin the discussion anew, fresh with actual information possessed by all parties and perhaps with a more reasonable and friendly tone, one that would be more likely to be conducive to the resolution of any misconceptions or confusions on your part regarding matters about which you seem to be concerned. We would hope that this supposed "Agreement" object has been duly verified, witnessed, and so forth as to be reasonable for a firm such as yours to make such a claim as was made in the February 29th letter as to its nature and contractual validity. Also, please provide us with any and all records that may be available and/or may be presently known by your firm to exist as far as any consideration, in the legal contractual sense, that Mr. Carstens or any other party may have provided, executed, or engaged in, with regard to said object, claimed as "The Agreement" as so described in your letter of February 29th, 2008. We are also interested in any and all background material that your firm may be presently in possession of representing full and responsible communication by any of the claimed bound parties that may represent adequate cognizant understanding of this supposed "Agreement" in the California Civil Code 1542 sense.

Be advised that any and all other actions on our part with regard to communications with and/or actions requested by your firm regarding this matter save the production and delivery of this letter that is before you now will, I'm sure you would agree, have to wait for the appropriate response regarding these requests [and those additional requests contained herein

below in this communication], and as our party does believe at this point, will also have to wait for a possible detailed discussion regarding said provided objects and documents and any referential material that your firm may or may not be in the proper legal possession of at this time. Such would be normal, I'm sure you would agree.

Also, such discourse would normally not be demanded in such an unreasonable time as to not allow proper considerations of such requests. Our party believes that 10 business days (which is the distance in time between February 29th, 2008 and March 17th, 2008) is not reasonable without risking significant debilitation of other life, business, and necessary personal pursuits with regard to future communications with your firm, doubly so if many of the informational requests made by us to your firm are honored and the verification thereof is therefore required. If your firm can provide us with any statute of any kind, current or otherwise in the British or American legal system that requires written response to any matter in any situation by any firm as a response to a civil request of this nature by any other firm or party that may be compel these parties to respond in a time less than 30 days and/or 20 business days, then this may be helpful to us in future discussions. In this vein, and without further need for substantiation, and in an attempt to reach an amicable solution to any and all concerns that your firm may have, I would ask that your firm would properly consider our requests of paragraph one and engage in reasonable additional discussions with Mr. Carstens, Mr. Kazanjy, Mr. Myers and Mr. Mellody. Please take your time. We can give you emails and possibly phone numbers if you request. We will also give at least as much time as you have given us. These discussions, we believe, will properly inform your firm as to the reasonable or unreasonable nature, and/or truthfulness or untruthfulness of the background information that may have led your firm to pen such a letter as the one to which we are now responding dated February 29th, 2008.

This may take some time, of course, so feel free to take a similar reciprocal amount of time equaling but not longer than 10 business days. For the sake of clarity, we shall place this deadline to be at the precise date and time to be 1:00PM Pacific Standard Time on March 18th, 2008. If communication and information with regard to our reasonable requests set forth in this letter before you dated March 3rd, 2008 are not satisfied and/or addressed by a reasonable time as listed above by us to your firm under the hire of Mr. Carstens, his companies or any other related party, we will assume that the matter has been resolved and/or has no validity and/or your firm has determined such claims to be erroneous and without basis and therefore no further communication on our part will be necessary.

Also, in the future, I would advise that inflammatory language such as "breach", "violation", and others contained in this letter by your firm of February 29th, 2008, should be avoided in further discussions unless substantial additional documentary evidence be provided. Please take this as friendly advice and not any kind of significant rebuke. This advice can be said to be doubly true as, in our present case, this language is found in the letter from your firm of February 29th, 2008 and the ensuing statements are being made wholly without substantiating or corroborating material. Please correct us immediately if these assertions regarding lack of corroborating material are not believed to be true by your firm. Unsubstantiated claims can have a negative effect on the tone of a given human conversation, and may lead to unnecessary delays and lack of goodwill from one or more parties should an amicable procedure be found to resolve any possible dispute that may or may not be in existence. That

being said, and despite the rather boorish and unsubstantiated initial communication from your firm, we are open and willing with respect to any and all methods that may be proposed with regard to a possible resolution of this supposed dispute that your firm is describing.

So, in addition to requesting that your firm provide any and all documentary evidence presently in the possession of your firm that said claims have any validity at all and in any sense, we are asking for a number of other pieces of information that we are positive your firm would believe would be reasonable for a party such as ours to request in a situation such as the one that it seems that your firm believes us to be in judging by the text contained in your letter of February 29th, 2008.

Further questions:

In paragraph one of your original and first communication letter to us dated February 29th, 2008, there is a reference to a company, PH(X) Glass, LLC. We were not aware of the existence of such a company and have had no previous business dealings with said company. It would help us if your firm could provide us with any details regarding the date of incorporation, ownership, and anything else that may help us determine relevant properties of this entity given the present discussions. An example of a specific and concrete piece of information in which we would be interested in would be whether the company existed at the time of June 1, 2005? Another example of specific information that we may require is whether the company is the supposed injured party or is the supposed injured party Mr. Carstens or both. This information will certainly help us when searching for any appropriate records on our side.

We have a series of specific temporal questions to ask your firm. These temporal questions contain and are not limited to the following: 1) When did this supposed breach as so described by your firm take place?; 2) What is the reason for what seems to be such an extended time lag between the supposed breach, if in fact it is as it seems to have taken place on or around July 1, 2005 by your letter dated February 29th, 2008, and this first communication by you and your client?

We have another question regarding statements made in paragraph two of your letter of February 29th, 2008. As you have stated, your firm believes that there has been some form of failure to pay under such an animal as described by your firm to be "The Agreement". If so, we would like more information in this regard. Is it the contention of your firm that no payments were ever made? If not, what would be the total amount of the payments that your firm would contend were paid, over what period of time, made under such an "Agreement" that your firm seems to be contending never had a period of validity? If payments were ever made, what would be the contention of your firm of the operating agreement under which these payments were made, given that the stated position of your firm seems to be that an immediate breach was made of your "Agreement". Essentially we are asking you to walk us through what your firm believes at the present time to be a plausible history. We are sure that if this situation is as cut and dried as your letter seems to suggest, this information should be readily available to Mr. Carstens.

Oh, and who is David Marglin and why was his name listed on the bottom of the letter from your firm dated February 29th, 2008, as a carbon copy recipient? We have determined that this

David Marglin was not a member of your firm, Shartsis Friese LLP, and we have no knowledge of any prior contact with such an individual. Is this David Marglin a party in this dispute? If so, what is his part in it? Does your firm contend that David Marglin is also an injured party? Does this David Marglin have relevant information to add to our discussion? If David Marglin is involved we would like your firm to share this information with us.

Also, in paragraph three of said letter by your firm dated February 29th, 2008, a reference is made to "Patent Rights, Trademark Rights". Please provide us with any information you may have with regard to the supposed patent your firm may be referencing. Please include the country of legal status of the patent, inventor names, possible patent defense history or licensing history, and patent numbers for unique identification. The trademark to which your firm is referring we would also request to be provided. In the normal course of discussion regarding such an object, we would like the date of the trademark, country and/or countries of validity, owner of trademark, length of time of ownership, and of course a unique identifier that would allow its unambiguous identification and verification. Were both of these objects in existence and in properly represented legal status at the time of June 1st, 2005? What is the contention of your firm regarding any possible confidential information transfer? What form did this confidential information take? How does your firm contend that this information was transmitted? Does your firm have any examples of said confidential information that may or may not have been transmitted?

Also, in paragraph three of said letter of February 29th, 2008, a statement is made regarding "disgorgement [We are particularly fond of that word, as it seems your firm is as well. In this vein, we will use it again, disgorgement!] of any revenues or profits associated with your sales of products...". Please provide us with a detailed description of said products that your firm seems to be claiming may be associated with these possible disgorgements and with any possible "Agreement". In this vein, and to help you with your questions regarding any possible disgorgements, we would like any information that your firm is presently in possession of that may contain but not be limited to technique of manufacture, physical dimensions and appearance, any existing design drawings, intended use, possible construction materials, specific gravity, intended market, list of current manufacturers, current list of customers, product trade categories and so forth. Without such a detailed description, it would be difficult for us to make any assessment as to the nature and depth of your firms claim with respect to any such association and/or claim to disgorgements. Again, if the exactitude of the claims of your letter of February 29th, 2008 is being represented correctly, then surely this information must already be in the possession of your firm and should not be difficult to produce.

Also, to specifically respond to the final sentence of paragraph three of your letter of February 29th, 2008, we would first, of course, need the requests for descriptions in the preceding paragraph of this letter to be at least partially fulfilled. To our knowledge, as we have been presented with zero information with which to make a determination, it would be impossible for us to return any judgment as to whether any item in our possession is associated with patent, trademark, technology or confidential information associated in any way with your client. (Keep in mind, at this point, we would reasonably believe it to be possible that your client may believe himself to be the inventor of the question mark.) A list of any inventory items in our possession that we would tabulate for your perusal will have to wait for a

description of said items unless we receive a response that your firm is interested in fact in all possessions, or possibly items of our choice without specific criterion presented by your firm. In this case we would have good reasonable grounds to refuse, we are sure you would agree.

The final sentence of paragraph four of your letter of February 29th, 2008 makes an additional request of us. Please consider that without any additional information provided by your firm, as we have requested in the body of this present letter, your firm should consider yourselves immediately so informed.

These are just the first questions and statements that we have for your firm upon perusing the contents of this sudden communication of February 29th, 2008. Please don't hesitate to call with any questions. A reasonable email address to use for the purpose of informal communication is roland.clarke@gmail.com. Feel free to ask any questions that you feel could be easily and quickly answered through such a communication method as email. We do reserve the right, however, to communicate and honor communications received in writing delivered by certified verifiable means only. If we do not receive a response by your firm containing the requested material by 1:00PM Pacific Standard Time on March 18th, 2008, sent by verifiable means through a reputable courier, we will operate under the assumption that such material either does not exist and/or has been deemed fraudulent by our firm and any and all claims made in your letter of February 29th, 2008 are thus invalid and have been dropped by your firm and Mr. Carstens and we will consider the matter closed.

Truly Best Regards,

*Rold Clarke*

Roland M. Clarke

650.815.5010

Cc:    Joe Maunch, Esq.
        Christopher Carstens

**EXHIBIT E**



**SHARTSIS FRIESE LLP**

One Maritime Plaza ♦ Eighteenth Floor
San Francisco, California 94111-3598

March 9, 2008

*VIA MESSENGER*

Mr. Roland Clarke
PIC Glassware, Inc.
1820A Encinal Ave.
Alameda, CA 94501

*VIA UPS*

Mr. Roland Clarke
909 Marina Village Parkway
Unite 249
Alameda, CA 94501

    Re:    <u>Breach of Technology and Patent Rights Sale Agreement</u>

Dear Mr. Clarke:

    We are writing in response to your letter dated March 3, 2008, as well as your telephone call of February 29, 2008, and your voicemail and email messages. Although we would prefer to resolve this matter cooperatively, we do not believe it would be productive to have any further conversations until you have retained legal counsel to represent you in this matter. We urge you to retain an attorney promptly, and have him or her contact us.

    Contrary to the statements in your letter, we do not believe that we are operating under any misconceptions. It is our understanding and belief that the only relevant written agreement that was signed by both yourself and Mr. Carstens is the June 1, 2005 Technology and Patent Rights Sale Agreement ("Agreement") referenced in our previous letter. In your letter, you state that the executed Agreement does not contain Sections 2.3 and 3.2, and you have asked us to provide a signed copy of the Agreement "that is being claimed to contain such a Section 2.3 and/or Section 3.2." Enclosed for your records is a signed copy of the Agreement containing such terms.

    Prior to sending our February 29, 2008 letter, we carefully investigated the relevant facts of this case and reviewed the corroborating materials provided to us by our clients. Your letter references other "self-contained … written agreements" between yourself and Mr. Carstens. Although we are well aware of the email correspondence, exchange of draft documents and other discussions between yourself and Mr. Carstens, as well as written agreements pertaining to unrelated matters such as your biodiesel business, it is our understanding that you and Mr. Carstens never amended the Agreement or signed any subsequent written agreements covering the same subject matter. The emails, discussions and draft documents referenced in your letter do not constitute a modification or amendment of the Agreement.

Tel: 415-421-6500 ♦ www.sflaw.com ♦ Fax: 415-421-2922

Mr. Roland Clarke
March 9, 2008
Page 2

We disagree with the overwhelming majority of the assertions in your March 3, 2008 letter, which is filled with unsubstantiated allegations and factual inaccuracies. Based on the tone and content of your letter, we do not believe it would be productive at this time to respond to such allegations. We will, however, clarify our requests to insure that you understand our previous letter. The terms "Patent Rights," "Trademark Rights," "Technology," and "Confidential Information" were specifically defined in the Agreement. Accordingly, we direct you to Article 1.0 DEFINITIONS of the attached Agreement for the meaning of such terms. With respect to the inventory, we request that you identify any products bearing the trademark "PHX," "pH(x)" or any other confusingly similar mark, as well as any other products which, if used, would infringe any Patent Rights. Such products would include those described on the Internet website associated with www.phxglass.com, which URL is included within the Trademark Rights.

Your letter refers to an "extensive collection of evidence" now in your possession. Although you have no duty to provide such evidence to us at this time, we would certainly consider it in good faith should you choose to provide it to us now. We also want to make clear that you do have a duty to preserve such evidence, which we will request during the discovery process if we are forced to file a lawsuit.

As noted above, we hope that you will retain legal counsel so that we can attempt to resolve this dispute without proceeding to litigation. If you choose to retain counsel, please have your lawyer contact us by no later than March 24, 2008. Although our clients would prefer to resolve this matter amicably, if we are not contacted by your legal counsel by the date set forth above, we intend to file a Complaint in the United States District Court for the Northern District of California to protect our clients' rights. If forced to proceed with legal action, our clients will seek to recover all of their monetary damages, costs and attorneys' fees, as well as treble damages based on your willful and deliberate infringement. We will also seek to enjoin you from any further acts of infringement which have caused, and will continue to cause, severe and irreparable harm to our clients. Nothing contained herein shall be deemed to constitute a waiver of any of our clients' rights or remedies, all of which are specifically reserved.

Very truly yours,

James P. Martin

JPM:smb
Encl.

7583\004\JMARTIN\1496457.1